**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
The Honorable Michael E. Romero**

| | |
|---|---|
| In re: | ) |
| | ) Case No. 13-21200 MER |
| CHISAN CHONG, aka CHRISTIAN | ) |
| CHONG, aka CHRIS CHONG | ) Chapter 7 |
| | ) |
| Debtor. | ) |
| | ) |
| | ) |
| DRCK, LLC, DAVID WILLIAM | ) Adversary No. 13-1577 MER |
| McCARTHY, and ROSEMARIE L. | ) |
| McCARTHY, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| CHISAN CHONG, aka CHRISTIAN | ) |
| CHONG, aka CHRIS CHONG, | ) Signed/Docketed |
| | ) December 18, 2014 |
| Defendant. | ) |

## ORDER

There is a well-established adage that if something sounds too good to be true, it probably is.  This case presents a situation where certain investors did not heed that adage to their detriment.

## JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334(a) and (b) and 157(a) and (b).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) as it concerns a determination as to the dischargeability of a particular debt.

## BACKGROUND FACTS

Debtor/Defendant Chisan Chong ("Chong") filed his voluntary Chapter 7 petition on June 28, 2013.  The Complaint filed by DRCK, LLC, William McCarthy and Rosemary McCarthy (the "Plaintiffs") asserts Chong's debt to the Plaintiffs is

nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(2)(B), (a)(4), and (a)(6).[1]

As background, the Plaintiffs learned of Direction Labs, Inc. ("DLI") in mid-2011, when Mr. McCarthy's former employee, Steven Linnenkamp ("Linnenkamp"), contacted him about an investment opportunity in a software development company which was being formed.  That company was DLI.

Chong and Linnenkamp, together with Greg Prewett and Matt Rutledge, formed DLI allegedly to use and develop software in which Chong had obtained an interest while working in South Korea.  According to the representations to the McCarthys, DLI's software could make hundreds of trades in the foreign currency exchange markets in very short periods of time.  Such speed purportedly minimized risk and offered up to 85% return on investments.[2]  As best stated in the parties' Stipulated Facts:

> Direction Labs Inc. was a company engaged in software and investment activities focusing on predictive analysis for markets and signaling software programs called "Second Sight" and "AutomaFX." Chong represented that his software programs provided "trading opportunities with the most opportunity with the least risk," with "dynamic risk management for each trade." Chong represented that Second Sight offers significantly increased investment performance over any other investment program available. Chong represented that his software programs for trading provided the consumer with "complete control" of the assets.[3]

On September 28, 2011, Mr. and Mrs. McCarthy purchased 50,000 shares of DLI through a Stock Purchase Agreement ("SPA"), for $500,000.[4]  In addition, a document entitled "Use of Proceeds," reflecting the projected use of

---

[1]  Unless otherwise noted, all future statutory references in the text are to Title 11 of the United States Code.

[2]  September 10, 2014 Transcript, p. 16, lines 4-11 and 15-16, and p. 17, line 25–p. 18, line 15.

[3]  Stipulated Facts, ¶¶ 15-18,  contained in parties' Pretrial Statement, Docket No. 30.

[4]  Stipulated Fact ¶ 19; Plaintiffs' Exhibit 9, Stock Purchase Agreement; Plaintiffs' Exhibit 11, Cashier's Check for $500,000.  It should also be noted the Use of Proceeds document, reflecting the projected use of the $500,000 for DLI expenses, was attached to the SPA (Exhibit 10 to Plaintiffs' Exhibit 9).

the $500,000 for DLI expenses was attached to the SPA.[5]  The 50,000 shares the Plaintiffs received were valued at $10 per share, based on Chong's assertion DLI was worth $10 million.[6]

The parties agree the $500,000 investment was for DLI corporate purposes only.[7]  They also stipulate on September 30, 2011, two days after the $500,000 payment to DLI, Chong transferred $300,000 of the $500,000 to his personal checking account without knowledge of the McCarthys.[8]  Thereafter, Chong transferred $290,000 of the $300,000 to the account of Chong Financial, another company he had set up, with the intent to trade the funds on the foreign currency exchange market.[9]

In January 2012, the McCarthys were approached about loaning or investing additional money.  Although Chong told Linnenkamp he preferred a DLI loan or additional investment, the McCarthys preferred a trading account. The McCarthys and their accountant, Ms. Mira Fine, met with Chong, Prewett, and Rutledge in DLI's office.  The McCarthys and their accountant heard presentations by Chong explaining how the trading software and trading process worked, using an overview document called a "pitch book" and income projections.[10]

Chong represented the requested funds were not an investment in DLI, but a trading account to be conducted through a "frontend" brokerage firm, which in turn used another firm's trading platform, with the account managed by Chong personally using the DLI software.[11]  Moreover, Chong asserted the account would allow the Plaintiffs to invest or withdraw funds at will, and would provide them online access allowing them to view trades daily.[12]  The entity through which the trading account was to be managed was Veruus Wealth

---

[5]  Exhibit 10 attached to Plaintiffs' Exhibit 9.

[6]  September 10, 2014 Transcript, p. 22, lines 2-11.

[7]  Stipulated Facts,  ¶ 22.

[8]  Stipulated Facts, ¶¶ 23 and 24.

[9]  September 11, 2014 Transcript, p. 197, lines 2-13.

[10]  Plaintiffs' Exhibits 38 and 68.

[11]  September 10, 2014 Transcript, p. 37, lines 7-16, p. 48, lines 5–16; September 11, 2014 Transcript,  p. 34, line 12 -p. 37, line 17.

[12]  September 10, 2014 Transcript, p. 48, lines 5-23, p. 65, lines 4-13, p. 108, lines 2-14, p. 109, lines 7-21; Plaintiffs' Exhibit 2, p. 2.

Management, LLC ("Veruus"), believed by the McCarthys to be another of Chong's companies.

On March 5, 2012, the McCarthy's entered into an Investment Agreement with DLI, and provided a cashier's check to DLI in the amount of $300,000 for the purpose of establishing the trading account.[13]  However, the $300,000 was not used for trading on the foreign currency exchange market, as promised.[14] Instead, according to Linnenkamp, Chong instructed him to use the money for DLI operating expenses.[15]  However, Chong told the McCarthys "linked accounts" had been established and Chong was creating an "internal fund scenario" to be set up in the United Kingdom.[16]

Eventually, Mr. McCarthy began asking to see the daily trades through the promised web site.  At Chong's instruction, Rutledge created a Veruus web site. Also at Chong's instruction, Linnenkamp entered fake data into the website to show foreign currency trades.[17]

Mr. McCarthy then raised his concern that the "trades" on the web site did not show a "trajectory" meeting the expected returns.[18]  By this time, both the $500,000 initial investment and the $300,000 "trading account" money were gone, and DLI could not meet payroll.[19]  When Linnenkamp met with Mr. McCarthy regarding the apparent failure to meet profit goals, he asked, according to Chong's instructions, for funds to "keep things going" until DLI

---

[13]  Plaintiffs' Exhibit 15, Investment Agreement, and 16, Cashier's Check.

[14]  September 11, 2014 Transcript, p. 169, lines 18-20.

[15]  September 11, 2014 Transcript, p. 42, lines 12-23.

[16]  September 10, 2014 Transcript, p. 39, line 18 –p. 42, line 4; September 11, 2014 Transcript, p. 64, line 9–p. 65 , line 15; Plaintiffs' Exhibit 17, p. 4; Plaintiffs' Exhibit 39, p. 2.

[17]  September 11, 2014 Transcript, p. 45, line 5- p. 46, lines 18, p. 73, lines 16-18; Plaintiffs' Exhibit 18.

[18]  September 10, 2014 Transcript, p. 49, line 20 – p. 50, line 6, p. 51, lines 5-19; Plaintiffs' Exhibit 19.

[19]  September 11, 2014 Transcript, p. 51, lines 14-20.

could obtain funds from other imminent deals from investors.[20]  The McCarthys provided DLI an additional $48,000 on or about June 1, 2012.[21]

On June 8, 2012, Linnenkamp and Chong met with Mr. McCarthy and admitted to him both the original $500,000 and the $300,000 were gone, and informed him the $300,000 had been used for DLI expenses, not trading. Despite Chong's assurances he would repay the Plaintiffs, DLI shut down soon thereafter and the Plaintiffs never received any repayment.

The Plaintiffs filed suit in the Denver District Court against Chong, Linnenkamp, DLI, Veruus, and Rutledge, setting forth claims of civil theft, conversion, breach of fiduciary duty, and unjust enrichment.[22]  As a result of Chong's failure to respond to discovery requests, a default judgment entered against him in the total amount of $1,635,197.46, including treble damages under the Colorado Civil Theft Statute, COLO. REV. STAT. § 18-4-405.[23]

## DISCUSSION

As a preliminary matter, the Court notes it has had the opportunity to evaluate the testimony of the witnesses, and in particular that of William McCarthy, Steven Linnenkamp, and Chong.  The Court finds the testimony of Mr. McCarthy to be credible.  Moreover, the Court finds the testimony of Linnenkamp, while reflecting Linnenkamp's own misdeeds, was also credible. By contrast, Chong's testimony was evasive and often unresponsive to questions, and generally lacked credibility on substantive issues.

**A.      Section 523(a)(2)(A)**

Section 523(a)(2)(A) states in relevant part:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--

.   .   .

---

[20]  September 11, 2014 Transcript, p. 52, lines 1-8.

[21]  September 11, 2014 Transcript, p. 52, lines 22-24.  Eventually, Chong gave the Plaintiffs stock certificates in return for the $48,000.

[22]  Stipulated Facts, ¶ 12.

[23]  Plaintiffs' Exhibit 4, Denver District Court Order dated April 17, 2013.

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--

> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. . .[24]

A claimant may sustain a claim under § 523(a)(2)(A) by proving false pretenses, false representation or actual fraud, and these three independent causes of action require proof of different elements.[25]  The Bankruptcy Appellate Panel for the Tenth Circuit explained the § 523(a)(2)(A) framework as follows:

> To sustain a claim for false representation under Section 523(a)(2)(A), the claimant must prove by a preponderance of the evidence that: 1) the debtor made a false representation; 2) with the intent to deceive the creditor; 3) the creditor relied on the false representation; 4) the creditor's reliance was [justifiable]; and 5) the creditor was damaged as a result.  *Fowler Bros v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996).  Intent to deceive can be inferred from the totality of the circumstances.  *Copper v. Lemke (In re Lemke)*, 423 B.R. 917, 922 (10th Cir. BAP 2010) (citing *Young*, 91 F.3d at 1375).

> False pretenses under Section 523(a)(2)(A) are implied misrepresentations intended to create and foster a false impression. . . . False pretenses can be "defined as any series of events, when considered collectively, that create a contrived and misleading understanding of a transaction, in which a creditor is wrongfully induced to extend money or property to the debtor."  *Stevens v. Antonious (In re Antonious)*, 358 B.R. 172, 182 (Bankr. E.D. Pa. 2006) (citing *Rezin v. Barr (In re Barr)*, 194 B.R. 1009, 1019 (Bankr. N.D. Ill. 1996)).

> A claimant may also sustain a claim under Section 523(a)(2)(A) by proving that the debtor engaged in actual fraud. . . . Actual fraud occurs "when a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right."  *Id.* at 690 (quoting

---

[24]  § 523(a)(2)(A).

[25]  *Bank of Cordell v. Sturgeon (In re Sturgeon)*, 496 B.R. 215, 222-223 (10th Cir. BAP 2013); *see also Diamond v. Vickery (In re Vickery)*, 488 B.R. 680, 691 (10th Cir. BAP March 13, 2013), *appeal docketed*, No. 13–1148 (10th Cir. April 11, 2013) (recognizing "[i]n order to give full effect to the plain meaning of the disjunctive 'or' in § 523(a)(2)(A), we conclude that 'actual fraud' is an independent basis for nondischargeability under that subsection.").

*Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (6th Cir. BAP 2001)).[26]

While the elements for each theory under § 523(a)(2)(A) differ, the common thread is a debtor's intent to defraud a creditor.

### 1. False Representations

To sustain a claim of false representation, the Plaintiffs must prove the following elements: 1) Chong made a false representation or material omission; 2) Chong made the representation or omission with the intent to deceive the Plaintiffs; 3) the Plaintiffs relied on the representation or omission; 4) the Plaintiffs' reliance was justifiable; and 5) Chong's representation or omission caused the Plaintiffs to sustain damages.[27]

### a. False Representations and Material Omissions.

Although Chong stressed the "Use of Proceeds" was not an "official" part of the SPA, the evidence nonetheless shows Chong represented the Use of Proceeds document reflected the proposed use of the Plaintiffs' initial $500,000. In fact, DLI's bank records reflect some of the money paid DLI expenses.

What Chong omitted to disclose was his intent to transfer the majority of the $500,000 to his personal checking account and then to the account of another company he controlled, for the purpose of trading in the foreign currency exchange market on his own behalf. Rather, during his conversations with the McCarthys, Chong represented their $500,000 would be used to fund development and improvement of trading software. He never told them he would take the money and use it in admittedly risky investments.

Further, Chong continually represented, through the initial $500,000 transaction, the $300,000 transaction, and the $48,000 loan, that DLI had many imminent deals coming to fruition, as well as many interested investors. The Court finds Chong's testimony about such deals to be lacking in credibility. At best, his representations to the McCarthys constituted mere puffery or exaggeration to create a false picture of DLI's potential value. At worst, Chong's representations about other deals were outright lies told to motivate the Plaintiffs to invest additional cash or to buy time after the Plaintiffs learned of his deception.

---

[26] *Id.*

[27] *See Field v. Mans, supra*, at 70; *Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 789 (10th Cir. 2010).

Page 7 of  21

Another blatant misrepresentation, of course, is Chong's assertion the second transaction, for $300,000, would be used to set up a trading account for the foreign currency exchange market, with the Plaintiffs to have full access to their funds and access to online information about the trading account's performance.  In reality, Chong used the $300,000 for corporate expenses, including his own six-figure salary, and instructed Rutledge and Linnenkamp to create a false web site for Veruus and to input false data for trades.  He admitted no trading account existed and no trades were ever made.[28]

This evidence definitively demonstrates Chong engaged in a continuous pattern of misrepresentation, omission and dissimulation for purposes of § 523(a)(2)(A).

> b.    <u>Chong Intended to Deceive the Plaintiffs.</u>

"Intent to deceive under [§ 523(a)(2)(A)] may be inferred from the totality of the circumstances, and includes reckless disregard of the truth.  Moreover, the *scienter* requirement may be established by material omissions."[29]  The Court has noted the lack of credibility of Chong's testimony, as well as the credibility of Mr. McCarthy's and Linnenkamp's testimony.  This, as well as Chong's actions, and in particular his concealment of what he would actually do with the Plaintiff's money and directions to fabricate trading accounts, clearly demonstrate his intent to deceive the Plaintiffs.  He simply told the Plaintiffs whatever would cause them to provide the money, disregarding the truth or falsity of his statements.

> c.    <u>The Plaintiffs Justifiably Relied on Chong's Misrepresentations</u>
> <u>and Omissions.</u>

McCarthy testified he and Mrs. McCarthy relied on Chong's statements as to the use of the money when they decided to invest in DLI.  The Court believes such reliance was genuine.  The question then becomes whether their reliance was justifiable.

It is important to note under § 523(a)(2)(A), the standard "is not 'reasonableness' in the sense of whether an objectively reasonable person would have relied upon the debtor's false representations.  Rather, the correct inquiry

---

[28]  September 11, 2014 Transcript, p. 169, lines 18-20.

[29]  *Columbia State Bank v. Daviscourt (In re Daviscourt)*, 353 B.R. 674, 685 (10th Cir. BAP 2006).

is whether the actual creditor's reliance was 'justifiable' from a subjective standpoint." [30]  As noted by Judge Tallman of this Court:

> In order for the Plaintiff to have justifiable reliance on a representation under 11 U.S.C. § 523(a)(2)(A), the Plaintiff need only perform a cursory inspection of the representation to the extent that it should be very obvious that the representation is fraudulent.  *Field v. Mans*, 516 U.S. 59, 71, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).  Justifiable reliance is not reasonable reliance, so the objective reasonable person standard does not apply; it is merely what a cursory examination of the representation would uncover.  *Id.* at 72, 116 S.Ct. 437.[31]

The evidence in this case shows Chong made effective presentations regarding the efficacy of the DLI software, demonstrating persuasive knowledge of both the software's functioning and the foreign currency exchange market. Although the Plaintiffs' accountant believed the investment of the $300,000 to be very risky, she acknowledged Chong was able to answer the "hard questions."  Further, while the McCarthys also recognized the foreign currency exchange market was risky, Chong's representations about the results already achieved with the software, and presentation about what could be achieved with the software, convinced the McCarthys the risk could be minimized.  In addition, Mr. McCarthy, as well as Ms. Fine, agreed Chong was an effective and confident speaker.  McCarthy also explained he had developed trust in Chong through meeting with him over a period of months.[32]  The Court finds this evidence supports a finding the Plaintiffs' reliance on Chong's false representations and omissions was justifiable.

While it is possible the Plaintiffs could have consulted additional professionals or done further research, that is not the legal standard.  The standard is whether people with the McCarthys' mind set and experience were justified in relying on Chong, and the Court finds this standard was satisfied.[33]

---

[30]  *Johnson v. Riebesell, supra,* at 791-92.

[31]  *Adams County Dept. of Social Services v. Sutherland-Minor (In re Sutherland-Minor)*, 345 B.R. 348, 354, n.4 (Bankr. D. Colo. 2006).  *See also Field v. Mans*, 516 U.S. at 74 and *Fowler Bros. v. Young*, 91 F.3d at 1373.

[32]  September 10, 2014 Transcript, p. 37, lines 21-24.

[33]  The Court also finds it irrelevant DLI used an attorney suggested by Mr. McCarthy (at Chong's and Linnenkamp's request) to draw up the SPA and Investment Agreement, as well as DLI's corporate documents.  There is no evidence whatsoever the attorney had any reason to know or believe the documents he drafted did not reflect the truth about the use of the Plaintiffs' funds.

        d.     **The Plaintiffs Suffered Damages.**

The issue of damages will be addressed more specifically below. Pursuant to § 523(a)(2)(A), however, the Plaintiff have established damages in the form of misused funds that were not repaid.  Based on the above findings the Court concludes the Plaintiffs have established the requisite elements of false misrepresentations for debt arising from the initial $500,000 investment, the $300,000 trading account investment, and the $48,000 loan to "keep things going" until the purportedly imminent, but actually nonexistent, deals came through.

*2.  False Pretenses*

The United States Bankruptcy Court for the District of New Mexico has recently described false pretenses:

> "Unlike false representations, which are express misrepresentations, false pretenses include conduct and material omissions." *Bank of Cordell v. Sturgeon (In re Sturgeon)*, 496 B.R. 215, 223 (10th Cir. BAP 2013).  False pretenses under § 523(a)(2)(A) are " 'defined as any series of events, when considered collectively, that create a contrived and misleading understanding of a transaction, in which a creditor is wrongfully induced to extend money or property to the debtor.' " *Id.* (quoting *Stevens v. Antonious (In re Antonious)*, 358 B.R. 172, 182 (Bankr. E.D. Pa.2006) (citations omitted)).[34]

For example, false pretenses may be shown when a debtor's statements and conduct conceal the debtor's true intent.[35]

Here, as described above, Chong's statements about what he would do with the $500,000 investment and the $300,000 trading account funds concealed his true plans for the money.  He led the McCarthys to believe the market's interest in the software was much more than it really was, and flat out lied about setting up a trading account.  All the time, he was failing to disclose his intent to use the money however he saw fit, setting up DLI's office and paying salaries and expenses without looking for other investors, using the

---

[34]  *Gross v. Osborne (In re Osborne)*, ___B.R.___, 2014 WL 5527883, at *3 (Bankr. D. N.M. Oct. 31, 2014).

[35]  *See Nielsen v. Pollan (In re Pollan)*, 2014 WL 2756527, at *4 (Bankr. D. Kan June 16, 2014) (Slip Copy) (finding the debtor's statements and conduct in purchasing and financing a car but arranging for a friend to make the loan payments created a false impression the friend would ultimately receive title to the car, concealing the debtor's secret intent to retain ownership).

investment funds to trade on his own, and using the trading account funds to pay DLI expenses.  Therefore, the evidence shows he obtained the Plaintiffs' money through false pretenses.

### 3.    Actual Fraud

As noted by the Bankruptcy Appellate Panel for the Tenth Circuit, "[a]ctual fraud occurs when a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right."[36]  In this case, the Court finds Chong engaged in an ongoing scheme to deprive the Plaintiffs of their money by misrepresenting the market interest in DLI's software, and using it for purposes other than developing the software, *i.e.*, trading it himself.  He also engaged in an ongoing scheme to obtain more funds by pretending he was going to set up a trading account, but using the money for DLI expenses and then putting false data on a web site to cover up the scheme.  Lastly, he obtained an additional $48,000 from the Plaintiffs by falsely representing additional deals were imminent.  Therefore, the Court finds the debt nondischargeable as arising from actual fraud.

## B.    Section 523(a)(2)(B)

In order for their debt to be nondischargeable under § 523(a)(2)(B), the Plaintiffs must show the debt was obtained by the use of a statement in writing: 1) that was materially false; 2) respecting Chong's or an insider's financial condition; 3) on which the Plaintiffs reasonably relied; and 4) that Chong caused to be made or published with intent to deceive.[37]

The Plaintiffs argue the SPA and Use of Proceeds documents, employing a greatly inflated valuation of DLI at $10 million, constitute false financial statements for purposes of § 523(a)(2)(B).  In addition, they assert the financial projections and documents, including the "pitch book"[38] used by Chong in

---

[36] *Sturgeon*, *supra*, at 223 (quoting *Vickery*, *supra*, at 690) (internal quotation marks omitted).  Moreover, false representations and implied misrepresentations that are intended to create and foster a false impression by co-conspirators in furtherance of a fraudulent scheme may be attributed to a debtor who is an active, willing and knowing participant in the fraudulent scheme for purposes of § 523(a)(2)(A).  *Id.*

[37] *Kaspar v. Bellco First Federal Credit Union (In re Kaspar)*, 125 F.3d 1358, 1359 (10th Cir. 1997); *Cousatte v. Lucas (In re Lucas)*, 300 B.R. 526, 531 (10th Cir. BAP 2003). The Court notes the standard of reliance under this subsection is "reasonable" rather than "justifiable" as under § 523(a)(2)(A).

[38] Plaintiffs' Exhibit 38.

making his presentation regarding the trading account, also comprise false financial statements under § 523(a)(2)(B).

With respect to the Plaintiffs' initial $500,000 investment, the Court cannot find those funds were obtained by the use of the SPA or associated documents, because the evidence indicates the Plaintiffs had already made the decision to invest based on Chong's fraudulent representations, false pretenses, and actual fraud. Rather, to the extent they contained materially false information, the SPA and associated documents memorialized Chong's false representations made in the past which induced the Plaintiffs to invest.

In addition, the $48,000 loan was made based on oral representations given at Chong's direction. That amount, therefore, does not fall within the scope of this subsection.

With respect to the $300,000 investment for the trading account, however, the evidence shows the financial projections[39] and the "pitch book"[40] contained materially false information. Based on the testimony regarding the effectiveness of Chong's presentation using these documents, the Court finds the Plaintiffs' reliance on information in these documents in making their decision to set up the trading account to be reasonable. Further, the Court finds the evidence, as discussed above, supports a finding Chong caused those documents to be made with the intent to deceive the Plaintiffs. Accordingly, in addition to other reasons for nondischargeability, the $300,000 trading account debt also falls under § 523(a)(2)(B).

## C.      Section 523(a)(4)

Pursuant to § 523(a)(4), "(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . . (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."[41]

The Court finds the evidence does not support a finding of fiduciary duty existing for either the initial $500,000 transaction nor the $300,000 trading account transaction. The $500,000 investment is a commercial transaction, and the documentation contains no indication of an express trust. In addition, the SPA specifically provides DLI is not an investment company within the meaning of the Investment Company Act of 1940; accordingly, a statutory trust does not

---

[39]  Plaintiffs' Exhibit 68.

[40]  Plaintiff's Exhibit 38.

[41]  § 523(a)(4).

exist.  For the same reasons, the evidence does not support a finding of fiduciary duty with respect to the $48,000 loan to meet payroll.

With respect to the $300,000 transaction, the Court notes the Colorado Supreme Court has declined to adopt a *per se* definition of securities brokers as fiduciaries.[42]  Rather, a Colorado Court will look at the control a broker has over a customer's account:

> If the broker has acted as an investment advisor, and particularly if the customer has almost invariably followed the broker's advice, this is an indication that the broker exercises functional control over his brokerage account and that the broker-customer relationship is fiduciary.[43]

Such a discussion might be pertinent if Chong had actually set up a trading account and managed the trades himself, as represented, yet done them improperly.  However, the Court finds the entire representation of Chong trading the $300,000 on an account set up for the Plaintiffs was false.  No account ever existed with respect to which Chong would have committed defalcation.  Rather, he simply continued his fraudulent misuse of the Plaintiffs' funds and his fraudulent misrepresentation as to what was being done with the funds.  Accordingly, a fiduciary relationship analysis is not relevant to these facts.

However, § 523(a)(4) does not require the existence of a fiduciary relationship in order to establish that a debt created by acts of embezzlement or larceny is nondischargeable in bankruptcy.[44]  The difference between embezzlement and larceny has been explained as follows:

> Embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come.  It differs from larceny in the fact that the original taking of the property was lawful, or with the consent of the owner, while in larceny the felonious intent must have existed at the time of the taking.
>
> . . .

---

[42]  *Paine, Webber, Jackson & Curtis, Inc. v. Adams*, 718 P.2d 508, 517 (Colo. 1986).

[43]  *Id.* at 516.  *See also Prymak v. Contemporary Financial Solutions, Inc.*, 2007 WL 4250020, at *12 (D. Colo. Nov. 29, 2007) (Not Reported in F. Supp. 2d) (citing *Paine*).

[44]  *See Bryant v. Lynch (In re Lynch)*, 315 B.R. 173, 175 (Bankr. D. Colo. 2004) ("A claim for nondischargeability under Section 523(a)(4) may rest on proof of larceny or embezzlement, without requiring proof of a fiduciary relationship.").

In short, section 523(a)(4) excepts from discharge debts resulting from the fraudulent appropriation of another's property, whether the appropriation was unlawful at the outset, and therefore a larceny, or whether the appropriation took place unlawfully after the property was entrusted to the debtor's care, and therefore was an embezzlement.[45]

Accordingly, the difference between larceny and embezzlement "is that with embezzlement, the debtor initially acquires the property lawfully, whereas larceny requires that the funds originally come into the debtor's hands unlawfully."[46]

Because the funds in this case were initially transferred from the Plaintiffs to Chong or his entities legally, larceny is not applicable.  Regarding embezzlement, however, this Court previously adopted the prevailing five-part standard in this District, requiring evidence of the following: 1) entrustment (originally lawfully obtaining); 2) of the property; 3) of another; 4) misappropriating the property (using it for a purpose other than that for which it is entrusted); and 5) with fraudulent intent.[47]

The evidence discussed above shows Chong and entities he controlled received the $500,000, $300,000, and $48,000 legally.[48]  That is, the Plaintiffs, believing in Chong's false representations and false pretenses, transferred those blocks of funds for investment, and for setting up a trading account. Thus, the first three criteria are satisfied.  Chong then used the property for his own purposes, not the purposes for which he received the money, and did so with fraudulent intent, as set forth above.  Therefore, the Plaintiffs have shown the

---

[45]  4 Collier on Bankruptcy ¶ 523.10[2] (16th ed.).  *See also Lynch*, 315 B.R. at 179 ("The courts define embezzlement and larceny as having the same elements, with the one distinction that, with larceny, the original taking and possession of property was unlawful rather than authorized."); *Hartwig v. Markley (In re Markley)*, 446 B.R. 484, 489 (Bankr. D. Kan. 2011) ("Embezzlement requires allegations of misappropriation of property of another by a person in whom said property was lawfully entrusted for a specific purpose. Larceny is misappropriation of property of another by theft.").

[46]  *In re Ghaemi*, 492 B.R. 321, 325 (Bankr. D. Colo. 2013).

[47]  *Adams v. Meagher (In re Meagher)*, 2012 WL 5893483, at *6 (Bankr. D. Colo. Nov. 23, 2012) (following *Bombardier Capital, Inc. v. Tinkler (In re Tinkler)*, 311 B.R. 869, 876 (Bankr. D. Colo. 2006) (citing *Bryant v. Tilley (In re Tilley)*, 286 B.R. 782, 789 (Bankr. D. Colo. 2002)).

[48]  Chong and DLI actually used the $48,000 loan for the purposes represented, that is, for payroll, so this subsection does not apply to that amount because it did not meet the misappropriation prong of the embezzlement test.  However, the $48,000 is nondischargeable under § 523(a)(2)(A), as discussed herein.

debt for these funds is nondischargeable as an embezzlement under
§ 523(a)(4).

## D.    Section 523(a)(6)

Section 523(a)(6) of the Bankruptcy Code provides "(a) A discharge under
section 727 . . . of this title does not discharge an individual debtor from any
debt . . . (6) for willful and malicious injury by the debtor to another entity or to
the property of another entity."[49]   The Tenth Circuit Bankruptcy Appellate Panel
has stated the following regarding § 523(a)(6):

> Section 523(a)(6) excepts from discharge any debt "for willful and
> malicious injury by the debtor to another entity or to the property of
> another entity."  To state a claim for relief under § 523(a)(6), the
> creditor must include allegations that would support a reasonable
> inference that the debtor caused a deliberate or intentional injury to
> the creditor. Debts resulting from recklessness or negligence do not
> fall within § 523(a)(6).
>
> . . .
>
> [A]s the Supreme Court made clear in *Kawaauhau v. Geiger*, an intent
> to cause injury is required to bring a debt within § 523(a)(6).  Since
> a person can convert property without intending to injure the interests
> others may have in the property, a creditor must include allegations
> suggesting the debtor committed the conversion with the intent to
> injure to adequately state a claim for relief under § 523(a)(6).[50]

Willfulness "may be established by direct evidence of specific intent to
harm a creditor or the  creditor's property.  Willful injury may also be
established indirectly by evidence of both the debtor's knowledge of the
creditor's . . . rights and the debtor's knowledge that the conduct will cause

---

[49]  § 523(a)(6).

[50]  *Barenberg v. Burton (In re Burton)*, 2010 WL 3422584, *6 (10th Cir. BAP, August
31, 2010) (unpublished decision) (citations omitted).

particularized injury."[51]  The requirement of maliciousness "is satisfied upon a showing the injury was inflicted without just cause or excuse."[52]

In this case, Chong and entities he controlled intentionally obtained the Plaintiffs' initial $500,000 investment, but did not use the majority of it for the represented purposes.  Instead, Chong used the majority of the $500,000 to trade on the foreign currency exchange market on his own behalf.  Thereafter, Chong intentionally obtained an additional $300,000 from the Plaintiffs to set up a trading account, but never did so.  Instead, he caused the funds to be used to pay DLI expenses, and created a fake web site with fake data to prevent the Plaintiffs from discovering his scheme.  Still later, he obtained $48,000 more from the Plaintiffs to meet payroll, after directing misrepresentations to be made to them about DLI's prospects.

This ongoing pattern of deceit demonstrates Chong intentionally and deliberately misled the Plaintiffs in the parties' transactions.  It also shows Chong knew or should have known his acts and omissions would cause the very financial damage to the Plaintiffs which they indeed suffered.  Accordingly, the Court finds, in addition to being nondischargeable under § 523(a)(2)(A) and § 523(a)(4), the Plaintiffs' debt is nondischargeble under § 523(a)(6).

## E.    Damages

The Plaintiffs provided a total of $848,000 in cash in exchange for Chong's promise to invest those funds in the foreign currency market.  Instead, Chong invested those funds for his own purposes.  Thus, the Plaintiffs are entitled to this sum in damages.

In this case, however, the Plaintiffs have also shown entitlement to treble damages under the Colorado Civil Theft Statute.[53]  "The basic elements of "theft" under Colorado statute parallel the standards applied in the Tenth Circuit

---

[51]  *Mitsubishi Motors Credit of America, Inc. v. Longley (In re Longley)*, 235 B.R. 651, 657 (10th Cir. BAP 1999).  *See also Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004) (willfulness may be shown where a debtor intends the injury or takes action substantially certain to cause the injury).

[52]  *Wagner v. Wagner (In re Wagner)*, 492 B.R. 43, 55 (Bankr. D. Colo. 2013) (citations omitted).

[53]  COLO. REV. STAT. § 18-4-401 *et seq*.

to determine whether an injury is willful and malicious under Section 523(a)(6)."[54]  Specifically, as noted by Judge Tallman of this Court:

> Two elements are required to constitute theft under Colorado law. The first element goes to conduct—exercising control over property of another without authorization. The second element goes to the result of the conduct—permanently depriving the owner of the use or benefit of the property. The statute prescribes a state of mind for each of the elements. The actor must knowingly exercise control over the property to satisfy the first element. To satisfy the second element, at minimum, the actor must knowingly act in such a way as to deprive the owner of the use of benefit of the property.[55]

The Court finds Plaintiffs have met their burden of proof by a preponderance of the evidence and are entitled to treble damages.  Under COLO. REV. STAT. § 18-4-405:

> All property obtained by theft, robbery, or burglary shall be restored to the owner, and no sale, whether in good faith on the part of the purchaser or not, shall divest the owner of his right to such property. The owner may maintain an action not only against the taker thereof but also against any person in whose possession he finds the property. **In any such action, the owner may recover two hundred dollars or three times the amount of the actual damages sustained by him, whichever is greater,** and may also recover costs of the action and reasonable attorney fees; but monetary damages and attorney fees shall not be recoverable from a good-faith purchaser or good-faith holder of the property.[56]

Under Colorado law, "theft" is broadly defined as follows:

> If any law of this state refers to or mentions larceny, stealing, embezzlement (except embezzlement of public moneys), false pretenses, confidence games, or shoplifting, that law shall be interpreted as if the word "theft" were substituted therefor; and in the enactment of sections 18-4-401 to 18-4-403 it is the intent of the general assembly to define one crime of theft and to incorporate

---

[54] *Tague & Beem, LLC v. Tague (In re Tague)*, 137 B.R. 495, 502 (Bankr. D. Colo. 1991).

[55] *C-Ball Ventures, LLC v. Oltmann (In re Oltmann)*, 505 B.R. 311, 316 (Bankr. D. Colo. 2014).

[56] COLO. REV. STAT. § 18–4–405 (emphasis added).

therein such crimes, thereby removing distinctions and technicalities which previously existed in the pleading and proof of such crimes.[57]

Further, COLO. REV. STAT. § 18–4–401 specifically sets forth the components of "theft" as follows:

(1) A person commits theft when he or she knowingly obtains, retains, or exercises control over anything of value of another without authorization or by threat or deception; or receives, loans money by pawn or pledge on, or disposes of anything of value or belonging to another that he or she knows or believes to have been stolen, and:

(a) Intends to deprive the other person permanently of the use or benefit of the thing of value;

(b) Knowingly uses, conceals, or abandons the thing of value in such manner as to deprive the other person permanently of its use or benefit;

(c) Uses, conceals, or abandons the thing of value intending that such use, concealment, or abandonment will deprive the other person permanently of its use or benefit;

(d) Demands any consideration to which he or she is not legally entitled as a condition of restoring the thing of value to the other person; or

(e) Knowingly retains the thing of value more than seventy-two hours after the agreed-upon time of return in any lease or hire agreement.[58]

In the instant matter, Chong knowingly used the Plaintiffs' funds for purposes other than their intended use. Further, he used the funds in such a manner as to deprive the Plaintiffs permanently of their use and benefit. Accordingly, the Court finds Plaintiffs have established a "theft" has occurred, and treble damages are proper under COLO. REV. STAT. § 18-4-405. Therefore, the $848,000 in actual damages will be trebled to $2,544,000.

---

[57] COLO. REV. STAT. § 18–4–403.

[58] COLO. REV. STAT. § 18–4–401.

**F.      Attorneys' Fees and Costs, Pre-judgment Interest and Post-judgment Interest.**

     *1.      Attorneys' Fees and Costs.*

     There is no bankruptcy statute or rule specifically providing for attorney fees in the context of § 523(a)(2), (a)(4) and (a)(6), FED. R. BANKR. P. 7054(b) provides for an award of costs to the prevailing party.[59]  Thus, the Court will allow reimbursement of costs incurred by the Plaintiffs in connection with this Adversary Proceeding in accordance with FED. R. BANKR.P. 7054 and 28 U.S.C. § 1920.[60]

---

[59]  FED. R. BANKR. P. 7054 provides:

(a) Judgments.  Rule 54(a)-(c) F.R.CIV.P. applies in adversary proceedings.

(b) Costs.  The court may allow costs to the prevailing party except when a statute of the United States or these rules otherwise provides.  Costs against the United States, its officers and agencies shall be imposed only to the extent permitted by law.  Costs may be taxed by the clerk on 14 days' notice; on motion served within seven days thereafter, the action of the clerk may be reviewed by the court.

[60]  28 U.S.C. § 1920, taxation of costs, provides:

A judge or clerk of any court of the United States may tax as costs the following:

     (1) Fees of the clerk and marshal;

     (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;

     (3) Fees and disbursements for printing and witnesses;

     (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;

     (5) Docket fees under section 1923 of this title;

     (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

A bill of costs shall be filed in the case and, upon allowance, included in the judgment or decree.

2.      *Pre-judgment and Post-judgment Interest.*

As recently noted by Judge Elizabeth Brown of this Court:

> Under federal law, prejudgment interest may generally be awarded if "1) the award of prejudgment interest would serve to compensate the injured party, and 2) the award of prejudgment interest is otherwise equitable." *In re Bakay*, 454 Fed. Appx. at 654 (citing *In re Inv. Bankers, Inc.*, 4 F.3d 1556, 1566 (10th Cir.1993)). "Thus under federal law prejudgment interest is ordinarily awarded, absent some justification for withholding it." *Id.* (citing *U.S. Indus., Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1256 (10th Cir.1988)). However, prejudgment interest is not recoverable as a matter of right but is instead governed by considerations of fundamental fairness. *Id.* The decision to award prejudgment interest is a matter left to the sound discretion of the trial court. *In re Butcher*, 200 B.R. at 680.[61]

The Court concludes the circumstances of this case warrant an award of pre-judgment interest at the Colorado statutory rate accruing from the date of the state court judgment, April 17, 2013. Therefore, pre-judgment interest shall be awarded at the rate of 8% per annum, compounded annually, pursuant to COLO. REV. STAT. § 5-12-102. In addition, the Court finds the Plaintiffs are entitled to post-judgment interest from the date of judgment until paid at the rate set forth in 28 U.S.C. § 1961.[62]

## CONCLUSION

Based on the findings and conclusions set forth above,

IT IS ORDERED Chong's debt to the Plaintiffs is nondischargeable pursuant to §§ 523(a)(2)(A), 523(a)(2)(B),[63] 523(a)(4), and 523(a)(6). A final Judgment shall enter in favor of the Plaintiffs and against Chong in the total amount of $2,544,000 in damages, plus pre-judgment interest at the rate set forth in COLO. REV. STAT. § 5-12-102, plus post-judgment interest at the rate set forth in 28 U.S.C. § 1961, plus costs incurred in connection with this adversary proceeding in accordance with FED. R. BANKR. P. 7054 and 28 U.S.C. § 1920.

---

[61] *McArthur Company v. Cupit (In re Cupit)*, 514 B.R. 42, 57 (Bankr. D. Colo. 2014).

[62]  28 U.S.C. § 1961 provides, in part: "Interest shall be allowed on any money judgment in a civil case recovered in a district court."

[63]  For clarification purposes, under § 523(a)(2)(B), Plaintiffs are entitled to only a $300,000 nondischargeability order.

IT IS FURTHER ORDERED that within fourteen (14) days from the date of this Order, the Plaintiffs shall file a bill of costs pursuant to FED. R. CIV. P. 7054 containing their respective total expenses under 28 U.S.C. § 1920 incurred in connection with this adversary proceeding.

Dated December 18, 2014                    BY THE COURT:

 

 

Michael E. Romero
United States Bankruptcy Judge